IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MARIO TARON EUBANKS,

     Petitioner,

v.                           Civil Action No. 3:19CV904

BARRY KANODE,

     Respondent.

## MEMORANDUM OPINION

Mario Taron Eubanks, a Virginia inmate proceeding with counsel, brings this petition pursuant to 28 U.S.C. § 2254 petition ("§ 2254 Petition," ECF No. 1) challenging his 1997 convictions in the Circuit Court of Richmond, Virginia ("Circuit Court") of murder and use of a firearm in the commission of a felony. Eubanks argues that he is entitled to relief on the following ground:[1]

Claim One:     "Petitioner is innocent of the charge convicted." (ECF No. 1, at 5.)

Respondent has filed RESPONDENT'S RULE 5 ANSWER AND MOTION TO DISMISS ("Motion to Dismiss," ECF No. 8) arguing that § 2254 Petition is untimely, and in the alternative, is barred from federal review. Eubanks failed to respond to the Motion to Dismiss. For the reasons set forth below, the Motion to Dismiss (ECF No. 8) will be granted.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions.

## I.   FACTUAL AND PROCEDURAL HISTORY

To understand the sole claim that Eubanks is actually innocent, the Court must first turn to the facts surrounding that contention.   In denying Eubanks's Petition for a Writ of Actual Innocence, the Court of Appeals of Virginia aptly summarized the procedural and factual history pertaining to Eubanks's claim of actual innocence as follows:

Eubanks was tried by a jury on October 10, 1997, upon indictments charging him with the murder of Wade King and the felonious use of a firearm.  King died from a gunshot wound to the head on January 11, 1996. Ballistic testing proved that the bullet fragment extracted from King's body during the autopsy could have been fired from the loaded gun found in Eubanks' possession upon his arrest on January 19, 1996.

During the early morning hours of January 11, 1996, when it was cold and snowy, Sonny Minor drove King from Ashland to the Richmond home of Pandora Moses to buy drugs.[2]  Minor waited in the car while King went inside a house.

Earlier, Moses had fallen asleep on the couch at the home of Urell Lewis, Moses' next door neighbor. Moses was awakened by an argument between King and Lewis. Lewis accused King of taking crack cocaine from her. Moses went outside after King, and he began running up the street.  Moses got in the backseat of Minor's car, and Lewis got in the front seat.  Lewis handed Moses a gun Lewis had obtained from Moses' house.  Moses returned the weapon to Lewis.  Lewis got out of the car.  Minor heard Moses say, "Get Mario."  Eubanks, who had been outside the house with his friend "Vaughn," got into the front seat of Minor's car.  Minor drove a few blocks to the intersection of Berwyn and Drake Streets, where King was sitting between some cars.  King approached the car to talk to Minor.  Minor exited the car, and King got into the driver's seat.  Eubanks, who had gotten out of the passenger seat, pulled out the gun Lewis had given

_____

[2] Moses' nickname was "Pansy."

2

Moses earlier and pointed it through the passenger side window, and fired.[3]   After the gunshot, Eubanks opened the car door, helped Moses from the backseat, and ran with Moses toward her house.

At first, Minor did not think King was hurt.   Once he realized King had been shot, Minor went to nearby houses to get help.   Eventually, Minor drove to a nearby business with a security guard and called the police.

After his arrest on January 19, 1996, Eubanks told the police that he was home with his mother at 2309 Drake Street the night of the shooting.   Eubanks claimed that he had found the gun twenty minutes before the police arrested him.

At trial, Eubanks asserted an alibi defense. Natasha Walton, Eubanks' cousin, testified that Eubanks was asleep in her Maury Street apartment when she got home from work at about 2:30 a.m. on January 11, 1996. Donald Walton (Donald), also Eubanks' cousin, stated that Eubanks arrived at the Maury Street apartment at about 9:50 p.m. on January 10, 1996.   According to Donald, he and appellant played cards and watched television, and they went to sleep in the same room at about 2:00 a.m.

Testifying in his own behalf, Eubanks stated that he spent the night of the shooting at his cousins' Maury Street residence.   Eubanks lived at 2309 Drake Street, about a block away from the shooting.   Eubanks claimed that on January 9, 1996, he found the gun the police later seized from him.   Eubanks denied that he ever fired the gun or that he shot King.

Alfred Smith, Eubanks' best friend, testified that he stayed at Moses' house on a snowy night in January of 1996.   Smith said that Moses was there with Smith's friend "Shane," but that Eubanks was not there.   Smith later learned that a homicide has occurred that night. Smith also stated that Shane died in March of 1996.

The jury rejected Eubanks' alibi defense and found him guilty as charged.   A new attorney was retained to represent Eubanks at sentencing.   The trial court sentenced appellant to forty-three years of imprisonment at a hearing on January 15, 1998.

---

[3] Moses identified Eubanks as the shooter.   Minor testified that he could not identify the person who shot King.

On or about January 29, 1998, Eubanks filed a motion for a new trial. The motion alleged that "[a]fter sentencing [on January 15, 1998], counsel for the defendant was approached by an individual outside of the [c]ourt, who apprised counsel of the fact that she witnessed the murder in which the defendant was convicted and that the defendant had not committed the crime." The motion further stated that "counsel for the defendant during the investigation of this cause has found witnesses who confirm the representations that the defendant is innocent." Counsel claimed that the new information had been obtained after trial and could not have been discovered prior to trial through diligence. The motion asked for a hearing to "allow the defense to provide testimony and witnesses to confirm and corroborate the allegations contained herein . . . ."

The trial court held a hearing on the motion on February 6, 1998, the twenty-second day after the trial court entered the sentencing order. At the hearing Eubanks' attorney stated:

> [O]ne of the difficulties we have been experiencing, which I believe the earlier trial attorneys experienced as well, is that we were trying to locate witnesses. And, we have finally been able to catch up with some of the witnesses. And, as a result of our inability and difficulty in locating the witnesses, that precluded us from basically getting to this court earlier than we did. When we did file this motion we only had one witness and we were hoping and we were still pursuing two additional witnesses. To this day we only have two witnesses that we can present to the court for purposes of presenting evidence as well as testimony. I believe that the information they have is material, because one of the witnesses we have been able to locate observed, if not the shooting, observed the parties prior to the shooting and immediately subsequent to the shooting. We have another individual who also observed the actual shooter and Ms. Pandora Moses running away from the scene.

The trial court found it lacked jurisdiction to entertain the motion under Rule 1:1.

While the case was on direct appeal, Eubanks wrote two letters to this Court stating he was convicted in

4

> October of 1997 because his "witnesses" did not appear
> in court.  He stated that the witnesses did not appear
> at trial due to a fear of the violent reputation of "O,"
> whom he claimed was the actual shooter.

(ECF No. 1-1, at 1-4 (first and second alteration added).)  On July 31, 1998, the Court of Appeals of Virginia denied Eubanks's petition for appeal.  Eubanks v. Commonwealth, No. 0324-98-2, at 1-3 (Va. Ct. App. July 31, 1998).  On November 4, 1998, the Supreme Court of Virginia refused his petition for appeal.  Eubanks v. Commonwealth, No. 981793, at 1 (Va. Nov. 4, 1998).

On July 29, 1999, Eubanks filed a petition for writ of habeas corpus in the Circuit Court that was dismissed on August 31, 1999.  See Eubanks v. Saunders, No. ML7311, at 1-9 (Va. Cir. Ct. July 29, 1999); Eubanks v. Saunders, No. ML7311, at 1-2 (Va. Cir. Ct. Aug. 31, 1999).  On February 14, 2000, the Supreme Court of Virginia refused Eubanks's petition for appeal.  Eubanks v. Saunders, No. 992604, at 1 (Va. Feb. 14, 2000).  Although Saunders was aware of the basis for his claim that he was actually innocent, he did not raise such a claim in his state habeas petition.

On April 30, 2001, Eubanks filed a Motion to Vacate his conviction that the Circuit Court denied on October 30, 2001.  See Table of Contents 1, Commonwealth v. Eubanks, No. F-97-970-F (Va. Cir. Ct.); Commonwealth V. Eubanks, No. F-97-970, at 1 (Va. Cir. Ct. Oct. 30, 2001).  On July 1, 2002, the Supreme Court of Virginia

refused Eubanks's petition for appeal.  Eubanks v. Commonwealth, No. 020270, at 1 (Va. July 1, 2002).

On February 26, 2014, Eubanks filed a Petition to Vacate Void Judgment, that was denied by the Circuit Court on April 11, 2014. See Eubanks v. Commonwealth, Nos. CR97-970-F-01, 02, at 1-4 (Va. Cir. Ct. Feb. 11, 2014).  On November 10, 2014, the Supreme Court of Virginia refused the petition for appeal.  Eubanks v. Commonwealth, No. 141068, at 1 (Va. Nov. 10, 2014).[4]  In 2016, Eubanks apparently filed yet another additional motion to vacate his conviction in the Circuit Court, which the Circuit Court denied.  (ECF No. 10, at 2.)  On May 2, 2017, the Supreme Court of Virginia dismissed Eubanks's appeal as not properly perfected. Eubanks v. Commonwealth, No. 161513, at 1 (Va. May 2, 2017).

On March 2, 2018, Eubanks filed a Petition for Writ of Actual Innocence pursuant to Va. Code Ann. § 19.2-327.10, in the Court of Appeals of Virginia.  Petition for Writ of Actual Innocence Based on Non-biological Evidence, Eubanks v. Commonwealth, No. 0351-18-2 (Va. Ct. App. Mar. 2, 2018).  On August 6, 2018, the Court of Appeals of Virginia dismissed the petition.  (ECF No. 1-1, at 1-

---

[4] The record reflects that during 2015, Eubanks sent many letters to the Circuit Court asking for relief the Circuit Court could not grant.  The Circuit Court explained to Eubanks that it could take no action on his letters or provide him with legal advice.  See Letter to Eubanks at 1-2, Commonwealth v. Eubanks, No. CR-97-0009705-01 (Va. Cir. Ct. July 30, 2015); See Letter to Eubanks at 1, Commonwealth v. Eubanks, No. CR-97-0009705-01 (Va. Cir. Ct. Sept. 3, 2015).

8.)   On December 7, 2018, the Supreme Court of Virginia refused the petition for appeal.  Eubanks v. Commonwealth, No. 181143, at 1 (Va. Dec. 7, 2018).

Eubanks filed the § 2254 Petition in this Court on December 5, 2019.  (ECF No. 1.)

## II.   ACTUAL INNOCENCE

Eubanks's sole claim in the § 2254 Petition is that he is actually innocent of the charges of conviction.   Therefore, his claim may be categorized as a "freestanding" claim of actual innocence.   See McQuiggin v. Perkins, 569 U.S. 383, 392 (2013). As the Court identified in its February 6, 2020 Memorandum Order, the Supreme Court has not explicitly recognized a freestanding claim of actual innocence as a basis for federal habeas relief. See id.  To the contrary, that court has "ma[de] clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claims considered on the merits" Herrera v. Collins, 506 U.S. 390, 404 (1993).  Notably, Eubanks has not raised an "otherwise barred constitutional claim[]" that his actual innocence would allow this Court to review.   As the Supreme Court explained in Herrera, and is applicable here,

"[Eubanks] does not seek excusal of a procedural error so that he may bring an independent constitutional claim

7

challenging his conviction or sentence, but rather
argues that he is entitled to habeas relief because newly
discovered evidence shows that his conviction is
factually incorrect. The fundamental miscarriage of
justice exception is available "only where the prisoner
<u>supplements</u> his constitutional claim with a colorable
showing of factual innocence." We have never held that
it extends to freestanding claims of actual innocence.
Therefore, the exception is inapplicable here.

<u>Id.</u> at 404-05 (citation omitted) (emphasis in original). The
Fourth Circuit has also stated that "the Supreme Court has strongly
suggested that claims of actual innocence standing alone do not
serve as an independent basis for habeas relief." <u>Buckner v. Polk</u>,
453 F.3d 195, 199 (4th Cir. 2006). Thus, it is unlikely that
Eubanks has raised a colorable claim for relief in light of the
current state of the law.[5]

Nevertheless, as discussed below, Eubanks's § 2254 Petition,
no matter the claim contained therein, is untimely filed, and the
Court reviews his actual innocence argument as a gateway to excuse
his procedural default.

---

[5] The Court believes that the analysis should end here as
neither the Supreme Court nor the Fourth Circuit has permitted
such a "freestanding" claim to proceed. Eubanks now has counsel
who has pursued his innocence claim for him in state court and in
the current proceeding. It is unclear why counsel did not raise
a constitutional claim in the current § 2254 Petition as the Court
can envision several such claims surrounding the affidavits relied
upon here. However, as it stands, such a claim was not raised.

### III.   STATUTE OF LIMITATIONS

Respondent contends that the federal statute of limitations bars Eubanks's claim.[6]   Section 101 of the Antiterrorism and Effective Death Penalty Act ("AEDPA") amended 28 U.S.C. § 2244 to establish a one-year period of limitation for the filing of a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court.   Specifically, 28 U.S.C. § 2244(d) now reads:

> 1.   A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.   The limitation period shall run from the latest of-
>
> **(A)**   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> **(B)**   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

---

[6] In the alternative, Respondent argues that the state court founds that Eubanks procedurally defaulted his claim of actual innocence and abused the writ because he could have raised but failed to raise this claim in his state habeas petition before the Supreme Court of Virginia, and this precludes federal review.   (See ECF No. 10, at 6-7.)   However, a petitioner may obtain review of his defaulted claims "if he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'"   Schlup v. Delo, 513 U.S. 298, 314-15 (1995) (alteration in original) (citation omitted).   This means that Eubanks must establish that his convictions resulted from a "constitutional error" and that he "is actually innocent of the crime."   Id. at 324.   Thus, as discussed below, the actual innocence inquiry to excuse a procedural default requires the same analysis as the actual innocence to excuse the untimely filing of his § 2254 Petition.

        (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

    2.   The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

**C.**   **Commencement And Running Of The Statute Of Limitations**

Eubanks's § 2254 Petition, filed nearly twenty years after the conclusion of his state habeas proceedings, is clearly untimely. Thus, the Court need not engage in a meticulous calculation of each time the limitations clock began to start, stop, and then run anew between his 1998 conviction and the filing of his § 2254 Petition. After his state court habeas proceedings had concluded, the Supreme Court of Virginia denied his first Motion to Vacate conviction on July 1, 2002. Generously construing the limitations to be statutorily tolled until that time (which it was not) for the purposes of this opinion, Eubanks had one year, or until July 1, 2003 to file a § 2254 Petition. Eubanks filed nothing further in state court, much less a § 2254 Petition, until February 27, 2014. Thus, the § 2254 Petition is clearly barred by the statute of limitations unless Eubanks demonstrates a plausible

basis for equitable tolling or a belated commencement of the limitation period under 28 U.S.C. § 2244(d)(1)(B)-(D).

Eubanks argues that: (1) he is entitled to equitable tolling; and, (2) that his actual innocence excuses his untimely § 2254 Petition. The Court addresses those arguments in turn.

## D.    Equitable Tolling

Petitions pursuant to 28 U.S.C. § 2254 are subject to equitable tolling. See Holland v. Florida, 130 S. Ct. 2549, 2560 (2010). The Supreme Court has "made clear that a 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."[7] Id. at 2562 (quoting Pace, 544 U.S. at 418). An inmate asserting equitable tolling "'bears a strong burden to show specific facts'" that demonstrate he fulfills both elements of the test. Yang v. Archuleta, 525 F.3d 925, 928 (10th Cir. 2008) (quoting Brown v. Barrow, 512 F.3d 1304, 1307 (11th Cir. 2008)).

_____

    [7] Thus, a petitioner must show a causal connection between the extraordinary circumstance and the delay. See Rouse v. Lee, 339 F.3d 238, 246 (4th Cir. 2003) (requiring a petitioner to demonstrate that "extraordinary circumstances beyond [petitioner's] control prevented him from complying with the statutory time limit.").

The Court can quickly dispense with Eubanks's discursive, vague arguments as they do not meet this exacting standard. Eubanks argues:

> Equitable tolling applies given the circumstances alleged regarding the discovery of the new evidence and the fact that Petitioner was proceeding pro se for portions of the earlier state appellate and post-conviction proceedings. . . . In this case, Petitioner has been pursuing his rights diligently since his conviction and has unequivocally maintained his innocence. Petitioner filed direct appeals and a writ of habeas corpus in state court. Subsequently, he filed motions to vacate his conviction. He later, through pro bono counsel, filed a petition for a writ of actual innocence which was appealed to the state supreme court. The Virginia Supreme Court dismissed his petition for writ of actual innocence on December 7, 2018. Accordingly, this petition is timely filed.[]

(ECF No. 1-1, at 18 (footnote omitted).) Eubanks seemingly suggests that simply because he pursued a great deal of litigation in state court, that somehow makes his federal habeas petition timely. That is not the case. Eubanks's vague arguments fail to demonstrate any extraordinary circumstance that prevented him from filing his § 2254 Petition in a timely fashion. Eubanks knew of the evidence that supported his claim of innocence as of February 1998, if not earlier. Eubanks did not raise his claim in his state habeas proceedings. Thus, the Court fails to discern either an extraordinary circumstance or diligence.

Even if the Court were to assume that Eubanks was "pursuing his rights diligently since his conviction," Eubanks alleged "diligent" pursuit of his rights in state court actually

12

demonstrates that Eubanks was well aware of how to pursue his rights in litigation and that his failure to do so here is of his own making.    Eubanks fails to demonstrate either aspect of equitable tolling.    Thus, Eubanks failed to act diligently in pursuing federal habeas relief, and, accordingly, he lacks entitlement to equitable tolling.

## IV.    ACTUAL INNOCENCE TO EXCUSE UNTIMELINESS

"Claims of actual innocence, whether presented as freestanding ones, or merely as gateways to excuse a procedural default, should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998) (citations omitted).    The Supreme Court has "described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'" House v. Bell, 547 U.S. 518, 555 (2006) (quoting Herrera, 506 U.S. at 417 (finding that "whatever burden a hypothetical freestanding innocence claim would require," even a petitioner who "cast considerable doubt on his guilt—doubt sufficient to satisfy Schlup's[8] gateway standard for obtaining federal review despite a state procedural default," would likely not satisfy it).

Here, the Court reviews Eubanks arguments under the more lenient standard for gateway actual innocence claims because his § 2254 Petition is untimely filed.    Even under the more lenient

---

[8] Schlup v. Delo, 513 U.S. 298 (1995).

standard for gateway actual innocence claims, Eubanks may obtain review of his claims "only if he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" Schlup, 513 U.S. at 314-15 (alteration in original) (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)).

A gateway claim requires a petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324. "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Id.

If a petitioner meets the burden of producing new, truly reliable evidence of his or her innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" and determines whether the petitioner has met the standard for a gateway claim of innocence. House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 327-28). The Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Sharpe v. Bell, 593 F.3d 372, 377 (4th Cir. 2010) (quoting Schlup, 513 U.S. at 327-28). "The Court need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim

14

with evidence of the requisite quality." Hill v. Johnson, No. 3:09CV659, 2010 WL 5476755, at *5 (E.D. Va. Dec. 30, 2010) (citing Weeks v. Bowersox, 119 F.3d 1342, 1352-53 (8th Cir. 1997); Feaster v. Beshears, 56 F. Supp. 2d 600, 610 (D. Md. 1999)).

Moreover, "actual innocence" means factual innocence and not just legal insufficiency. See Calderon v. Thompson, 523 U.S. 538, 559 (1998) (alteration in original) (citations and internal quotation marks omitted) ("[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence."). Furthermore, with respect to claims of actual innocence,

> The Supreme Court has instructed that, "when considering an actual-innocence claim in the context of a request for an evidentiary hearing, the District Court need not 'test the new evidence by a standard appropriate for deciding a motion for summary judgment,' but rather may 'consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'"

Carter v. Commonwealth of Va., No. 3:09CV121-HEH, 2010 WL 331758, at *4 (E.D. Va. Jan. 26, 2010) (quoting House, 547 U.S. at 537).

A.   **Summary Of The Presented Evidence At Trial**

Eubanks raised his claim of actual innocence in the Court of Appeals of Virginia, and the Court has already set forth a brief summary of the evidence of his guilt and the facts and circumstances surrounding the claim as provided by that court. Nevertheless, the Court must review "all the evidence' old and new." House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 327-

15

28).[9]  As summarized below, the evidence introduced at trial of Eubanks's guilt was substantial and compelling.

### 1.   The Prosecution Case

On a snowy January 11, 1996, Sonny Minor agreed to drive Wade King, from Ashland, to his brother's house after 2:30 a.m.  (Oct. 10, 1997 Tr. 33, 35, 46.)  While they were in the car, King asked Minor to take him to Pandora ("Pansy") Moses's house in the southside of Richmond instead, and King agreed to drop him off there.  (Oct. 10, 1997 Tr. 34, 46.)  Minor asked King to wait for him, and King entered the house.  From the car, Minor could hear arguing from inside the house.  (Oct. 10, 1997 Tr. 34.)  Pansy testified that she was asleep in Urell Lewis's house and she awoke to Lewis and King arguing because King had stolen crack cocaine.  (Oct. 10, 1997 Tr. 65-66, 80-81.)  Pansy explained that Eubanks and his friend Vaughn were next door at Pansy's house at the time.  (Oct. 10, 1997 Tr. 81.)

Minor saw a man come out of the house and asked him what was going on inside.  (Oct. 10, 1997 Tr. 35.)  The man indicated that they were arguing over "some stupid shit," and then continued walking.  (Oct. 10, 1997 Tr. 35.)  The man returned, and Minor asked him to tell King to hurry up; however, it took another 10 to

---

[9] Although the Court of Appeals of Virginia supplied a good summary of Eubanks's guilt, the Court must review and consider all the evidence presented at trial.

15 minutes for King to leave the house.  (Oct. 10, 1997 Tr. 35.)
King and Pansy approached Minor's car, but then King started to
run away and told Minor "to come on."  (Oct. 10, 1997 Tr. 35, 66.)
Pansy approached Minor and told him that King "had five [crack]
rocks of hers and she wanted her rocks back."  (Oct. 10, 1997
Tr. 36.)  Minor testified that Pansy "was saying go get Mario,"
(Oct. 10, 1997 Tr. 36-37), and then she got into the back of
Minor's car.  (Oct. 10, 1997 Tr. 86.)  Urell got into the passenger
seat of Minor's car.  (Oct. 10, 1997 Tr. 36-37, 68.)  Urell handed
Pansy a gun that she had retrieved from Pansy's house and she got
out of the car.  (Oct. 10, 1997 Tr. 68, 85.)  Pansy gave the gun
back to Urell.  (Oct. 10, 1997 Tr. 68.)  Pansy testified that she
did not see what Urell did with the gun, but that "O" or "Mario"
Eubanks also got in Minor's car.  (Oct. 10, 1997 Tr. 68-71, 87.)
Minor, Eubanks, and Pansy proceeded to drive to try and find King.
(Oct. 10, 1997 Tr. 37, 68, 71.)  At that point, Pansy was sitting
in the back seat on the passenger side and Eubanks was in the front
passenger seat.  (Oct. 10, 1997 Tr. 38-39, 70-71.)  Minor's car
was a two-door vehicle.  (Oct. 10, 1997 Tr. 56.)

    Minor saw King near a stop sign, rolled the window down, and
he asked King to give Pansy the drugs back.  (Oct. 10, 1997 Tr.
39.)  King entered the car through the driver's side window and
tried to crawl across to "get to Pansy in the back," and Minor
heard King say the word "here."  (Oct. 10, 1997 Tr. 53-54.)  Minor

got out of the car through the window and King slid into the driver's seat with the door still open. (Oct. 10, 1997 Tr. 55, 62, 88.) Eubanks had gotten out of the car and pointed the gun at King through the car window. (Oct. 10, 1997 Tr. 55, 90-91.) King had his hands in the air. (Oct. 10, 1997 Tr. 60.) Minor asked Eubanks three times not to shoot King, but he fired anyhow, and shot King. (Oct. 10, 1997 Tr. 40, 57, 63-64, 73.) Pansy testified the gun was the same one Urell tried to hand her. (Oct. 10, 1997 Tr. 74.) Pansy and Eubanks then took off running down the street. (Oct. 10, 1997 Tr. 40, 75.) As soon as Minor realized King had been shot, he looked for help, and eventually found a security guard at a nearby building and had him call the police. (Oct. 10, 1997 Tr. 41, 59.)

Minor informed police that Pansy was in the car and a man named Mario who he did not know and could not identify had shot King. (Oct 10, 2017 Tr. 42-43, 45.) King eventually died from a single gunshot wound to the head. (Oct. 10, 1007 Tr. 124-25.)

During trial, Pansy identified Eubanks as "Mario," and indicated that Eubanks was the person who fired the gun the night of the shooting and that the gun used belonged to Eubanks. (Oct. 10, 1997 Tr. 76-77, 97-98.) Pansy also explained that a man named Shane lived at her house at one time (Oct. 10, 1997 Tr. 93), that Shane was friends with Eubanks, and that she did not know any other Mario that hung around with Shane. (Oct. 10, 1997 Tr. 83.) Pansy

18

testified that she first identified the shooter to police as "O" and "then [she] told him Mario." (Oct. 10, 1997 Tr. 96.) Pansy explained that she, Urell, and Eubanks all sold drugs. (Oct. 10, 1997 Tr. 97.)

On January 19, 1996, around 11:00 p.m., Officer Ories observed Eubanks "milling about in front of [7-Eleven]," so he approached him. (Oct. 10, 1997 Tr. 109-10.) Eubanks placed his hand in his right front jacket pocket as Officer Ories approached and Officer Ories "saw what [he] thought was the butt of the revolver." (Oct. 10, 1997 Tr. 110.) Officer Ories recovered a loaded revolver and additional .38 caliber rounds from Eubanks's right front jacket pocket. (Oct. 10, 1997 Tr. 111-13.) The bullet removed from King's head during the autopsy was a .38 class caliber and could have been fired from the type of revolver recovered from Eubanks. (Oct. 10, 1997 Tr. 102, 104.)

### 2. The Defense Case

Natasha Walton, Eubanks's cousin, testified that Eubanks was at his aunt's house the night of the shooting. Walton testified that she saw Eubanks asleep in her brother's room after 2:30 a.m. and then again at 9:00 a.m. on January 11, 1996. (Oct. 10, 1997 Tr. 128-29, 131.) Donald Ray, Walton's brother, testified that Eubanks came to the house at 9:50 p.m. on January 10, 1996 and the two played cards and watched television until they went to bed around 2:00 a.m. (Oct. 10, 1997 Tr. 136-37, 140.) Donald

testified that he, Eubanks, and his friend Vaughn, were close and used to hang out together.  (Oct. 10, 1997 Tr. 143.)

Alfred LaVaughn Smith, or "Vaughn," testified that he spent the night at Pansy's house on a night in January when there was snow on the ground, but that he did not remember the specific day. (Oct. 10, 1997 Tr. 146-47, 152.)  According to Vaughn, Shane and Pansy were at the house, but Eubanks was not there that night. (Oct. 10, 1997 Tr. 148.)  Vaughn noted that he and Eubanks had been at Pansy's house together at night in "like December."  (Oct. 10, 1997 Tr. 148.)  Eubanks and his mother lived about a block away from where the shooting occurred.  (Oct. 10, 1997 Tr. 155.) Vaughn indicated that he had seen Eubanks earlier that night, around 9:00 p.m., out on the street.  (Oct. 10, 1997 Tr. 150.) Shane and Pansy left Pansy's house that night around 12:30 and he did not see them again.  (Oct. 10, 1997 Tr. 148.)  Vaughn testified that he fell asleep at the house and never heard a commotion outside.  (Oct. 10, 1997 Tr. 149-50.)

Vaughn also testified that a different person named Mario, nicknamed "'O' Dog" or "O," was friends with and hung around with Shane.  (Oct. 10, 1997 Tr. 148-49.)  Vaughn explained that he and Mario Eubanks were best friends, but that the only reason Eubanks would have been around Shane was if Eubanks was hanging out with Vaughn.  (Oct. 10, 1997 Tr. 153-54.)  Vaughn testified that Shane died in March of 1996.  (Oct. 10, 1997 Tr. 151.)

Notably, none of the three defense witnesses came forward and spoke with the police at any time. (Oct. 10, 1997 Tr. 154, 184.)

Eubanks testified in his own defense. He indicated that he had visited Pansy's house previously to buy marijuana. (Oct. 10, 1997 Tr. 167.) Eubanks agreed that he had "seen a fellow by the name of Shane there" and that he had "seen a fellow by the name of Mario there" who was also nicknamed "O." (Oct. 10, 1997 Tr. 168-69.) Eubanks explained that on January 10, 1996, he arrived by bus to his aunt's house around 10:00 p.m. (Oct. 10, 1997 Tr. 170.) Eubanks testified that the first time he heard about the shooting was when he got "locked up" in February. (Oct. 10, 1997 Tr. 173.) Eubanks explained that the gun and bullets that he was caught with on January 19, 1996, he found "[a]t the Golden Food Market behind the dumpster . . . around the 9th" of January. (Oct. 10, 1997 Tr. 173-74.) Eubanks admitted that he found the gun prior to the night he stayed at his cousin's house, and prior to the shooting. (Oct. 10, 1997 Tr. 174-75, 176.)

Detective Fleming testified that Eubanks was arrested three times between February 19, 1996 and June 5, 1997 but the charges were withdrawn the first two times due to missing witnesses. (Oct. 10, 1997 Tr. 183-84, 188.) Detective Fleming noted that none of Eubanks's defense witnesses contacted police to provide Eubanks with an alibi during that year and a half leading up to the October 10, 1997 trial. (Oct. 10, 1997 Tr. 184.) Detective Fleming

testified that when he arrested Eubanks on February 19, 1996, Eubanks told him that he was at home with his mother the night of the murder, had played basketball with Donald Ray, and had been at his girlfriend's house earlier that evening. (Oct. 10, 1997 Tr. 192-93.) Eubanks made no mention of his aunt or being at his aunt's house that night to Detective Fleming. (Oct. 10, 1997 Tr. 193.) Detective Fleming also explained that Eubanks first told him that he did not have a gun but then admitted that he had been arrested for possessing a firearm on January 18, 1996. (Oct. 10, 1997 Tr. 193-94.)

**B.    Eubanks's New Evidence of Innocence**

Eubanks contends that he has three eyewitnesses to the shooting that would identify another individual as the shooter. (See ECF No. 1-1, at 14, 35.) Eubanks did not file a statement or affidavit from any of these three alleged eyewitnesses with his § 2254 Petition. Instead, the Court found the affidavits in the exhibits submitted with his Petition for Writ of Actual Innocence Based on Non-biological Evidence filed in the Court of Appeals of Virginia.

**1.    February 6, 1998 Affidavit of Daledrika Price**

In support of his claim of actual innocence, Eubanks submitted an affidavit of Daledrika Price dated February 6, 1998. Price states as follows:

22

I am making this affidavit because during the early part of January, 1996, I observed an act which Mario Eubanks was later convicted for wrongfully. I do not remember the exact date, but I do remember it was the early part of January, 1996 and I was over my cousin's house which is located at the Drake and Lynhaven intersection. It was approximately between 2 to 3 a.m. in the morning and we were playing cards (spades). It was three of us playing. My cousin, Ta'Tasha and Tracy Banks. During the time I was at my cousin's house, my daughter, Parris was with me and sleeping in Ta'Tasha's bedroom. My daughter woke up and came into the living room around the time period that I mentioned. She somehow got hold of the cards and tore some of the cards.

Because we were not finished the game, Ta'Tasha decided to go across the street and borrowed a deck of cards from people she knew. When she went outside, I followed her to the door because it was dark outside and because it was snow on the ground. While she was walking across the street, I heard loud voices coming from a car located near the intersection of Berwyn and Drake. I looked in the direction of the sound and I saw a male figure stand up from the driver side of a car. The male figure saw me and spoke up by saying, "What's up Drik." I said who is that and he said "Shane" and I said "what's up." He did not say anything else, because at this point I went back into the house because it was cold outside.

At first when I saw him, I did not recognize him because it was dark. But when he mentioned his name, I became aware of who he was because of his voice and because I was able to see him eventually because of the lighting in the street.

I went into the house and maybe a minute or so later, not long, I heard a gunshot. Because my cousin was outside, I ran to the door and looked out. In looking out I saw, Shane running to the passenger side of the car, open the door and helped a girl out from the backseat whose name is Pansy. I saw them run away for the car towards where Pansy lives.

I never reported this to the police because my boyfriend did not want me to get involved. Secondly, Shane and Pansy had a lot of dealing with the wrong people, Poison Clan. I was afraid that if I opened my mouth and talk to the police that I would be killed, my boyfriend be killed or my baby hurt.

Also, please be informed that I was not aware that Mario Eubanks was arrested for this charge and convicted

23

> until I appeared at his sentencing on January 15, 1998.
> For almost a year I was in Patterson, New Jersey living
> with my aunt, Shirley Price.  It was not until I returned
> that I became aware of the events.
>
> I recognize Shane that night because I have seen
> him around . . . since the summer of 1995.  He has gone
> under the name of "O", "Mario" and "Shane."

Petition for Writ of Actual Innocence Based on Non-biological
Evidence Ex. H, Eubanks v. Commonwealth, No. 0351-18-2 (Va. Ct.
App. Mar. 2, 2018).

    **2.    September 13, 2017 Affidavit of Daledrika Price**

Price also provided counsel with a second affidavit on
September 13, 2017.  Much of this affidavit is the same as her
original affidavit.  Price states as follows:

> In January 1996, I witnessed a crime for which Mario
> Eubanks was later convicted.  I did not come forward
> initially because I was scared.  I spoke to a lawyer in
> February 1998 and gave him an affidavit.  To the best of
> my recollection that was the only person I spoke to about
> this event.
>
> One early morning in January 1996, I was over my
> cousin's house.  The house was located at the
> intersection of Drake and Lynhaven.  At about 2 or 3am,
> we were playing cards.  Tatisha Houseal and Tracy Banks
> were with me, and my daughter Paris was asleep in the
> bedroom.  My daughter woke up and came into the room and
> tore some of the playing cards, so Tatisha went across
> the street to borrow a deck of cards.  I followed her to
> the door because it was dark outside and there was snow
> on the ground.  While Tatisha was walking across the
> street, I saw a car stopped at the intersection of Berwyn
> and Drake.  I heard loud voices coming from inside the
> car.  I saw a male figure stand up from the driver side
> of the car.  The man saw me and said "What's up, Drik."
> I recognized him as Shane, and said "what's up."  I
> recognized his voice, and could see him in the street
> lighting even though it was dark outside.  I went back
> inside because it was cold.  About one minute later, I
> heard a gunshot.  Beside my cousin was outside, I ran to

the door and looked out.   I saw Shane running to the
passenger side of the car, and opened the car door to
help a girl out the backseat.   The girl he helped out
was Pansy Moses, and the two of them ran off in the
direction of the house where Pansy lived.
        . . . .
        The man I saw and knew as "Shane" also went by the
nicknames "Mario" and "O."  At that time, I knew Mario
Eubanks from the neighborhood.   I am absolutely certain
that the man I saw that night was Shane, and not Mario
Eubanks.  They did not look similar.   After the shooting,
I went to live with my aunt Shirley Price in Patterson,
New Jersey for about a year.   I did not learn that Mario
had been convicted until February 1998.   I have heard
that Shane has since died, and I have not seen him around
in years.
        Recently, I have been in contact with Mario Eubanks
and his family.   I moved around over the years, but have
settled back in Richmond.   I voluntarily met with his
lawyer, Miriam Airington.   After meeting with me, she
prepared this Affidavit. . . .

Petition for Writ of Actual Innocence Based on Non-biological

Evidence Ex. I, Eubanks v. Commonwealth, No. 0351-18-2 (Va. Ct.

App. Mar. 2, 2018).

> **3.   February 6, 1998 Affidavit of LaFonda Antanette**
>       **Hicks**

In the state court, Eubanks also submitted a February 6, 1998

affidavit of LaFonda Antanette Hicks another alleged eyewitness.

Hicks provided:

I am making this affidavit to inform you of what I saw
on January 11, 1996.
        On this date, I was at Lisa Staton's house which is
located on Berwyn Street, near the intersection of
Yorktown and Berwyn.   I was over at Lisa's house because
she is my child's godmother and wanted to see my child.
My child had just come home from the hospital on January
2, 1996 and this was Lisa's first opportunity to see the
baby.

> It was around 2 a.m. in the morning, when I had
> gotten up to feed my baby. I heard a gunshot from
> outside and I laid my baby down and went to the window.
> When I went to the window I saw Pansy and Shane running
> down the street from the direction of Drake and Berwyn
> Streets.

Petition for Writ of Actual Innocence Based on Non-biological Evidence Ex. J, Eubanks v. Commonwealth, No. 0351-18-2 (Va. Ct. App. Mar. 2, 2018).

### 4.   Alleged Statement of Tatisha Houseal

Eubanks identifies Tatisha Houseal as the third eyewitness. (ECF No. 1-1, at 25.)  However, Eubanks provided no affidavit or sworn statement for Houseal in the state court and once again fails to provide such a statement here.  At most, Eubanks states:

> A third eyewitness, Tatisha Houseal, came forward in
> 2016 after moving away from Richmond, with an
> independent account exonerating Petitioner.[]  Like Ms.
> Price and Ms. Hicks, Tatisha Houseal was frightened to
> come forward because she was afraid of retaliation from
> the actual murderer.  It should be noted that Ms. Houseal
> was so frightened of the actual shooter's ability to
> retaliate against her, that she waited until she moved
> away from Richmond to come forward.
> . . . . In July 2017, [] Ms. Houseal affirmed
> her account to counsel by telephone.

(Id. at 25-26 (footnote omitted).)  However, as neither Houseal, nor counsel, provided an affidavit or sworn statement as to Houseal's account of the identity of the real shooter, this statement is not "new reliable evidence" and will not be considered here.  Schlup, 513 U.S. at 324.

C.    **The Credibility Of Eubanks's Evidence**

The Supreme Court has explained that to be credible, three types of "new reliable evidence" may support a petitioner's allegations of innocence. <u>Schlup</u>, 513 U.S. at 324. These include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." <u>Id.</u> Eubanks's actual innocence claim is not accompanied by "exculpatory scientific evidence" or "critical physical evidence" not presented at trial. <u>Id.</u> Eubanks contends that his evidence falls under the category of "trustworthy eyewitness accounts."

1.    **The Evidence Is Not "New"**

a.    **The Testimony Was Available Before Eubanks's Conviction Was Final**

Eubanks knew about both Hicks's and Price's testimony prior to his conviction becoming final on January 15, 1998. As the Court of Appeals of Virginia noted, Eubanks explained in letters to the Circuit Court that he wanted both Price and Hicks to testify at his trial, thereby suggesting that he knew about both of these witnesses prior to or around the time of his trial in October 1997. (<u>See</u> ECF No. 1-1, at 7 n.4.) Counsel also knew that both Price and Hicks could provide defense testimony "as he asserted information they provided as grounds for the motion for a new trial." (<u>Id.</u> at 7.) Therefore, this evidence is certainly not

"new," and for this reason alone, Eubanks's claim of actual innocence fails.

Eubanks contends that he could not obtain Hicks's or Price's testimony any earlier because both witnesses were scared. However, Hicks offers no reason why she failed to come forward with her testimony until February 1998, well after the October 10, 1997 trial. Price claims that she was scared to speak to police because she did not want to get involved and was worried that she, or her family could be killed. However, Eubanks's best friend testified that the person who Eubanks clearly identifies now as the real shooter, a man named Shane, died in March 1996, a mere two months after the shooting. Thus, it is unclear how Shane, if he was the true killer, remained a threat to Price or any of Eubanks's witnesses at the time of Eubanks's trial on October 10, 1997.

### b. The Evidence Was Available In 1998

Even if the Court were to construe the evidence as "new" as of February 1998, Eubanks had this evidence in hand to support his claim of actual innocence at that time, but he failed to present this evidence to any court until around 20 years later. Price and Hicks swore out affidavits on February 6, 1998, the day of the hearing of the motion for a new trial. Thus, Eubanks's actual innocence claim was also clearly available to Eubanks in February 1998, immediately after his sentencing, and before his direct appeal. Eubanks could have also raised his claim that he was

28

innocent based on this evidence in his state habeas petition that was filed in 1999, but he did not.   Again, Eubanks could have raised his claim of actual innocence in this Court more than twenty years ago, but again, he did not.   See McQuiggin, 569 U.S. at 399 ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing [of innocence]."). Eubanks vaguely states that he was pursuing his rights, but he was clearly not using the available affidavits to support his argument of innocence.[10]   Although

---

[10] In rejected his Petition for Writ of Actual Innocence, the Court of Appeals of Virginia explained as follows:

> In his timely-filed motion for a new trial, Eubanks's counsel stated that he had been approached by a witness outside the courtroom after the sentencing hearing.   In support of the motion for a new trial, defense counsel sought to produce evidence from the witness who had approached him at sentencing, as well as one other witness he had discovered, who would testify about what they saw just before and after the gunshot was fired on January 11, 1996.   Price confirmed in her 1998 affidavit that she attended Eubanks' sentencing hearing.   The testimony of the two witnesses that counsel proffered at the February 6, 1998 hearing paralleled the affidavits of Price and Hicks executed that same day.

> "[T]he writ if actual innocence is statutorily limited to the late discovery of previously unknown or unavailable evidence that could not have been gained through diligent efforts at the time of trial _and_ that would cause no rational trier of fact to find the petitioner guilty had it been available."   In re Adams, 44 Va. App. 266, 268, 604 S.E.2d 746, 747 (2004) (emphasis added).   The record before us demonstrates that, before Eubanks's convictions became final, his attorney knew that Price and Hicks were witnesses, as he asserted information they provided as grounds for the motion for a new trial.   The trial court was unable to entertain the witnesses' testimony because the hearing

Eubanks's reasons for the delay in providing these witness accounts is weak at best, and the evidence certainly fails to qualify as "new," there are several other reasons why Eubanks fails to satisfy the requirements for a gateway claim of actual innocence.

###### 2. The Evidence Is Not "Trustworthy Eyewitness Account[s]"

Eubanks also fails to satisfy the requirement that the new evidence must be reliable. Schlup, 513 U.S. at 324. With respect to Hicks's affidavit, she avers that she was visiting her godmother's house with a new baby, heard a gunshot, and "saw Pansy and Shane running down the street." See supra Part IV.B.3. The affidavit provides no context, including how Hicks knew Shane or Pansy and could be certain of her identification of the two

---

on the motion occurred more than twenty-one days after sentencing and counsel had not obtained an order modifying, vacating, or suspending final judgment. . . .

Notwithstanding this circumstance, Eubanks has failed to prove by clear and convincing evidence, that his attorney did not know about the information from Price and Hicks. . . . .

(ECF No. 1-1, at 6-7 (footnote omitted) (emphasis and alteration in original).) The Court of Appeals of Virginia concluded that "Eubanks did not prove that the 'newly discovered evidence' upon which he now relies was unknown or undiscoverable before his convictions became final in the trial court," and therefore, it did not consider the materiality of the evidence or whether it "prove[s] that no rational trier of fact would have found proof of guilty or delinquency beyond a reasonable doubt." (Id. at 8 (alteration in original) (citations omitted).)

individuals.   Thus, Hicks's affidavit also lacks some indicia of reliability for this reason.

More importantly, despite Eubanks's characterization of the two affiants as "eyewitnesses," neither Price nor Hicks observed the shooting.   Eubanks states, "[t]his evidence - eyewitness testimony of three independent, objective witnesses who saw another person named Mario shoot and kill Wade King - supports the conclusion that Mario Eubanks is actually innocent of this crime." (ECF No. 1-1, at 26.)   However, this a gross mischaracterization of the proffered evidence.   The affidavits clearly establish that neither witness observed the actual shooting of King and therefore cannot be considered reliable eyewitness accounts of that shooting.

Thus, the evidence proffered here by Eubanks is neither new, nor an eyewitness account of the shooting, and is doubtfully reliable.   Nevertheless, the Court turns to the second part of the actual innocence inquiry and examines all of the evidence.

D.   Consideration Of All The Evidence

If a petitioner meets the burden of producing new, truly reliable evidence of his or her innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" and determines whether the petitioner has met the standard for a

31

gateway claim of innocence. House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 327-28). The Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Sharpe v. Bell, 593 F.3d 372, 377 (4th Cir. 2010) (quoting Schlup, 513 U.S. at 327-28). Based on the total evidentiary record, the Court must "make a probabilistic determination about what reasonable, properly instructed jurors would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." House, 547 U.S. at 538.

Eubanks argues that the new evidence not disclosed at trial weakens the Commonwealth's narrative at trial such that it is probable that no reasonable juror could find him guilty of the murder of King beyond a reasonable doubt. That is not so. Contrary to Eubanks's arguments, this evidence does not contradict the testimony at trial such that no reasonable juror would find him guilty beyond a reasonable doubt. Instead, based on the evidence presented at trial, which is summarized above, compelling evidence exists of Eubanks guilt and the new evidence fails to alter that conclusion.

First, neither Price nor King observed the actual shooting of King. Thus, neither witness could say with any certainty that Shane, not Eubanks, shot King. Neither witness testified that she

saw anyone with a firearm before or after the shooting.  Rather, both Hicks and Price were inside the house when they heard a gunshot.  Hicks averred that she heard a gunshot, looked out the window, and saw "Shane and Pansy" running down the street.  See supra Part IV.B.3.  Price averred that she saw Shane out on the street prior to the shooting, said hello to him after he said hello to her, and then she went back into the house.  Price testified she then heard a gunshot, ran to the door and looked out, and saw "Shane running to the passenger side of the car," helping Pansy out of the car, and then observed Shane and Pansy run away.  See supra Part IV.B.1-2.  Notably, neither affiant stated affirmatively that they did not see Eubanks, but only saw this person named Shane.  In her first affidavit, Price did not even mention Eubanks or his whereabouts except to conclude that she "observed an act which Mario Eubanks was later convicted for wrongfully."  See supra Part IV.B.1.  However, Price did not see the actual shooting, and she is not competent to testify as to whether Eubanks was wrongfully convicted.

In her 2017 affidavit, Price, for the first time, averred that she was "absolutely certain that the man [she] saw was Shane, not Mario Eubanks."  See supra IV.B.2.  Again, Price did not swear that she never saw Eubanks that night or that Shane and Pansy were the only individuals out on the street.  That would simply be untrue based on the record.  Price herself explained that her

friend was outside getting playing cards. Sonny Minor testified that there were other people out on the street when he was waiting for King.

Second, these affidavits must be treated with a fair degree of skepticism when reviewed with the testimony from trial. Indeed, both affidavits contradict Eubanks's own testimony from trial about the identity of this man named Shane and the identify of Mario or "O." Clearly, Eubanks wants the Court to believe that Shane was the killer of King, and that Shane was also named Mario or "O." However, no one testified during trial that Shane was also nicknamed Mario or "O." Only Price's 1998 and 2017 affidavits indicate that Shane also went by Mario or "O." To the contrary, the testimony at trial established that Shane had a friend who was nicknamed Mario or "O," and they were two different people. Eubanks testified that Shane and another man named Mario or "O" or "O Dog" were friends during trial. (Oct. 10, 1997 Tr. 168-69.) Eubanks's best friend, Vaughn, testified consistently that another Mario, nicknamed "'O' Dog," was friends with Shane. (Oct. 10, 1997 Tr. 149.)

The evidence clearly demonstrated that Pansy asked for someone to get Mario, and that Mario was the person who shot King. Pansy identified Eubanks by the name Mario or "O" and testified that Eubanks was friends with Shane. (Oct. 10, 1997 Tr. 76-77, 96-98.) Pansy indicated that Eubanks was the only Mario or "O"

34

she knew.   (Oct. 10, 1997 Tr. 83.)   Pansy also testified that Mario and his cousin, Vaughn, were together at the time of the shooting. (Oct. 10, 1997 Tr. 69-70.)   Thus, while the identity of Shane is completely unclear, any reasonable juror could find that Eubanks was the only Mario or "O," and was the person who killed King.

The main thrust of Eubanks's argument of his innocence is that Pansy, the only witness who could identify Eubanks as the shooter, lied during trial to protect her associate Shane and to obtain favorable treatment from the Commonwealth in her own related criminal proceedings.   Eubanks contends that "Ms. Moses conveniently and falsely implicated [Eubanks] - a teenaged boy living in a rough neighborhood - who lived in the same neighborhood and had the same first name, to throw suspicion from her friend and curry favor with the Commonwealth."   (ECF No. 1-1, at 26.) However, the new evidence does not cast a doubt on the veracity of Pansy's testimony at trial.   The Court fails to discern, and Eubanks fails to adequately explain, why Pansy would have lied under oath about the identity of the shooter at the time of the trial.   Eubanks's theory is based on speculation and conjecture and makes little sense when placed in the context of the timing of Eubanks's criminal proceedings.

The shooting occurred on January 11, 1996.   Shane apparently died in March 1996.   Eubanks's trial did not occur until October 10, 1997.   Thus, it is unclear why Pansy would testify falsely as

35

to Eubanks's involvement, if instead, Shane, a dead man, had been the real shooter. Rather, it would be far simpler to point to a dead man as the shooter. By the time of trial, Pansy could fear no retribution from this man Shane, and she would have no need to lie to protect him from prosecution. The Court also fails to discern, and Eubanks fails to back up his statement with any record evidence, as to how identifying the shooter as Shane, as opposed to Eubanks, would yield any favorable treatment for Pansy in her own criminal proceedings.[11] During trial counsel explored this possibility and questioned Pansy about receiving favorable treatment in exchange for her testimony. Pansy indicated that she had received none, and the jury credited Pansy's account of the events. The record at trial did not persuasively bear out Eubanks's theory that Pansy was lying for advantage or to cover for a different suspect, and neither affidavit changes that conclusion.

As importantly, Shane's death in March of 1996, would have conveniently provided Eubanks with an easy target to shift the blame upon for the shooting. Shane's death ensured that he could

---

[11] Eubanks argues that Pansy "was initially charged with murder and used [Eubanks] as a scapegoat." (ECF No. 1-1, at 27.) However, this too makes little sense considering the uncontroverted testimony was a man named Mario shot King, not a woman.

not and would not contest the accusation.[12]  See Herrera, 506 U.S at 423 (O'Connor, J., concurring) (explaining that affidavits were suspect because there was "no reasonable explanation for the nearly decade-long delay" in producing them, and "[w]orse, they conveniently blame a dead man- someone who will neither contest the allegations not suffer punishment as a result of them.")

Although both witnesses state that they saw Shane with Pansy after the shooting, this does little to counter the evidence that Eubanks was the shooter.  Neither witness stated that they did not see Eubanks that night.  Eubanks himself initially told the first officer who interviewed him that he was home at his mother's house within a few blocks from the shooting on January 11, 1996.  Eubanks said that he had been with his girlfriend and another friend prior to being at his mother's house.  Notably, neither Eubanks's mother, nor his girlfriend, were called as witnesses at his trial. Although Eubanks later had two cousins testify that he was at another location at the time of the shooting, the jury clearly found this testimony incredible, when weighed with the testimony

---

[12] Eubanks attempts to distance himself from people who were allegedly members of the Poison Clan.  However, it appears that he too was an associate of these same people and both Price and Hicks clearly knew these individuals as well.  An inference may be drawn that those witnesses who claimed they were afraid to come forward previously may have also been afraid of Eubanks or of getting involved at all.

that placed Eubanks at the scene of the shooting.[13] In addition, Eubanks was found with a .38 caliber firearm eight days after the shooting. The fatal bullet removed from King's head was a .38 caliber bullet. Eubanks himself testified that he had this gun in his possession at least two days prior to the shooting.

Simply put, given the totality of the evidence, Eubanks fails to demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Sharpe, 593 F.3d at 377 (internal quotation marks omitted) (quoting Schlup, 513 U.S. at 327). Neither Price nor Hicks observed the shooting and therefore neither can say definitely that Eubanks was not the shooter. Sonny Minor testified that Pansy requested a man named Mario, and that this man shot King. Pansy testified that she called for Mario, Mario shot King, that Eubanks was Mario, and that Eubanks was the only Mario she knew. The jury observed the demeanor of the witnesses and found Eubanks's alibi incredible, and Pansy's testimony credible. The evidence simply does not bear out the narrative Eubanks wants the Court to believe —that he was just an innocent teenaged boy who was wrongfully blamed for murder by members of a gang. Thus, Eubanks has failed to meet the threshold requirements for a gateway actual innocence

---

[13] Eubanks's story apparently evolved from his initial statement to police, through his three arrests for the shooting charges, up until the eventual trial when he clearly wanted to blame the shooting on Shane.

claim.  Accordingly, Eubanks's § 2254 Petition is untimely, and will be dismissed.

## IV.  OUTSTANDING REQUEST

At the end of his brief attached to his § 2254 Petition, Eubanks's request as evidentiary hearing.  This request fails to comply with the Local Rule 7 which states that all motions "shall be accompanied by a written brief setting forth a concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies."  E.D. Va. Loc. Civ. R. 7(F)(1).  Moreover, Eubanks has failed to show that he is entitled to an evidentiary hearing.  In determining whether a case warrants an evidentiary hearing, a federal court must consider whether the evidentiary hearing would provide the petitioner the opportunity to "prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  Schriro v. Landrigan, 550 U.S. 465, 475 (2007); see Mayes v. Gibson, 210 F.3d 1284, 1287 (10th Cir. 2000).  A federal court must also consider the standards set forth in 28 U.S.C. § 2254 when considering whether an evidentiary hearing is appropriate.  Schriro, 550 U.S. at 474.  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  Id.

Here, based on a thorough evaluation of Eubanks's claim and the record before the Court, the Court concludes that Eubanks's claim lacks merit. Therefore, the Court concludes that habeas relief under § 2254 is not warranted. Eubanks's request for an evidentiary hearing will be denied.

### V. CONCLUSION

For the foregoing reasons, Respondent's Motion to Dismiss (ECF No. 8) will be granted. Eubanks's § 2254 Petition (ECF No. 1) will be denied and his claims will be dismissed. Eubanks's Request for Evidentiary Hearing will be denied. The action will be dismissed. A certificate of appealabilty will be denied.

The Clerk is directed to send a copy of Memorandum Opinion to Eubanks and counsel of record.

It is so Ordered.

Date: Februar 24, 2021
Richmond, Virginia

/s/ REP
Robert E. Payne
Senior United States District Judge